# STATE OF MICHIGAN

# COURT OF APPEALS

FIFTH THIRD BANK,

Plaintiff-Appellant/Cross-Appellee,

v

COUZENS LANSKY FEALK ELLIS ROEDER
& LAZAR, P.C., MARK S. FRANKEL, and
DONALD A. WAGNER,

Defendants-Appellees/Cross-
Appellants.

UNPUBLISHED
January 12, 2016

No. 323654
Wayne Circuit Court
LC No. 11-012531-NM

Before: TALBOT, C.J., and CAVANAGH and K. F. KELLY, JJ.

PER CURIAM.

Plaintiff, Fifth Third Bank (Fifth Third), appeals as of right from an order granting defendants, Couzens Lansky Fealk Ellis Roeder & Lazar, P.C., Mark S. Frankel, and Donald A. Wagner (collectively defendants) summary disposition in this legal malpractice action. Defendants cross-appeal from the order. Because we conclude that the trial court properly granted summary disposition for defendants, there is no need to address the issues on cross appeal.

## I. BASIC FACTS AND PROCEDURAL HISTORY

The underlying facts of this case are long and convoluted. This is the third time the parties have been before the Court. See *Fifth Third Bank v Danou Technical Park, LLC*, 493 Mich 857; 820 NW2d 782 (2012) (quiet title action) and *Danou Technical Park, LLC v Fifth Third Bank*, 497 Mich 905; 856 NW2d 54 (2014) (class action). Because the present case involves defendants' recommendations and actions in the prior cases, we review the salient facts from each case.

## A. QUIET TITLE ACTION

Samir Danou is the majority and controlling member and manager of plaintiff, Danou Technical Park, L.L.C. (DTP). In 2001, DTP owned vacant land in Allen Park, which it intended to sell to Home Depot for $7.25 million (Home Depot property). To avoid incurring tax liability on the sale of this property, DTP sought to structure a "1031 Exchange" in accordance with the United States Tax Code, 23 USC 1031. Such an exchange permitted a property owner to take

the sales proceeds from appreciated property and invest the monies in new property to avoid the recognition of the taxable gain. The property identified by DTP to purchase for the exchange comprised two buildings located at 2500 Enterprise Drive and 16500 Oakwood Boulevard in Allen Park, Michigan (Enterprise property).

Typically, to obtain the tax benefit under a § 1031 exchange, DTP would purchase the Enterprise property after the sale of the Home Depot property, but the owner of the Enterprise property was not willing to wait for the sale of the Home Depot property. To ensure the availability of the Enterprise property, DTP contracted with Asset Preservation, Inc. to serve as an exchange agent. To facilitate the property exchange, Asset Preservation, Inc. formed API Properties Eighty-Nine, L.L.C. (API). DTP entered into a Qualified Exchange Accommodation Agreement with API wherein API was to acquire ownership of the Enterprise property for $8,250,000.00, utilizing funds provided by DTP. DTP provided $3 million of its own funds, with the remaining $5.25 million borrowed from Fifth Third[1]. DTP then "loaned" $8.25 million to API to obtain the Enterprise property.

As part of this process, API executed a mortgage and promissory note on February 12, 2001, in the amount of $8.25 million to DTP. The loan was "non-recourse," meaning API incurred no financial liability in the transaction. The only remedy available to DTP upon default under the contract would be foreclosure and taking possession of the Enterprise property. This mortgage was filed with the Wayne County Register of Deeds on March 21, 2001. Because DTP had not yet received a signed purchase agreement from Home Depot, DTP collaterally assigned the API Note and Mortgage to Fifth Third as additional collateral for the $5,250,000 loan.

A sale of the real property to Home Depot never occurred. Therefore, on August 9, 2001, API executed a quit claim deed for the Enterprise property to DTP. The quit claim deed did not include any language indicating a discharge of the API Mortgage for this exchange. DTP then executed a new mortgage in favor of Fifth Third on the Enterprise property on August 23, 2001, which was recorded on September 25, 2001.

Approximately six months later, on February 23, 2002, Fifth Third Bank and DTP executed a Mortgage Modification Agreement, which amended the API mortgage so that the principal amount of the mortgage was reduced to $5,250,000, which was the amount DTP owed Fifth Third, and extended the maturity date for payment.

In 2008, DTP defaulted with a principal balance of approximately $4 million owing to Fifth Third.

Fifth Third initiated foreclosure on DTP's August 23, 2001, mortgage. Plaintiff submitted a full credit bid at the May 6, 2009 sheriff's sale. The redemption period expired on November 6, 2009 and DTP made no attempt to redeem.

---

[1] Fifth Third Bank is the successor in interest of Old Kent Bank, which was identified as the "Lender" on the original promissory note and mortgage to DTP.

In order to obtain actual possession of the Enterprise property, Fifth Third initiated summary proceedings in district court. While the district court action was pending, on November 24, 2009, DTP executed an Assignment of Mortgage of the API Mortgage to SMD Estate, Inc., a company formed by Danou for estate planning purposes. When SMD attempted to foreclose by advertisement, Fifth Third initiated a quiet title action, asserting that the doctrine of merger extinguished the API Mortgage and that API's debt to DTP was eliminated by delivery of the quit claim deed by API to DTP, as no outstanding debt existed to support the API mortgage. SMD filed a counter-complaint alleging it was entitled to specific performance based on Fifth Third's failure to return the original API Note and by refusing to discharge the Collateral Assignment. SMD also sought a declaratory judgment that the API Mortgage was in full force and effect. The parties filed competing motions for summary disposition.

The trial court held that there was no merger of the title and mortgage when DTP received the quit claim deed. The trial court also rejected Fifth Third's claim that there was no debt or obligation between API and DTP to support the API Mortgage. The trial court agreed that Fifth Third's submission of a full credit bid at the sheriff's sale extinguished DTP's debt owed to Fifth Third and any security interest held by plaintiff in DTP's debt and that, once the debt was satisfied and the mortgage was extinguished, Fifth Third was required to release the Collateral Assignment. It entered judgment in DTP's favor.

This Court reversed in *Fifth Third Bank v Danou Technical Park, LLC*, unpublished opinion per curiam of the Court of Appeals, issued March 20, 2012 (Docket No. 302884), concluding:

> The trial court erred when it determined that the API Note and Mortgage had continuing validity after API Properties transferred the Enterprise Property to Danou Technical. Because there was no factual dispute concerning whether the API Note had been paid in full, the trial court should have concluded that—as a matter of law—the API Mortgage had no continuing validity and SMD Estate could not commence a foreclosure action to secure payment of a nonexistent debt. Consequently, the trial court should have granted Fifth Third's request for quiet title. For these reasons, we vacate the trial court's order and declaratory judgment of February 11, 2011 and remand this matter for entry of an order and judgment denying [DTP] and SMD Estate's motion for summary disposition, granting Fifth Third's cross-motion for summary disposition, and quieting title to the Enterprise Property in Fifth Third. [slip op, p 8.]

The Supreme Court denied DTP's application for leave to appeal. *Fifth Third Bank v Danou Technical Park, LLC*, 493 Mich 857; 820 NW2d 782 (2012).

B. THE CLASS ACTION

Under the terms of the Fifth Third mortgage and underlying note, DTP had agreed to pay reasonable attorney fees and legal expenses paid or incurred by Fifth Third in protecting and enforcing its rights and obligations and in collecting or attempting to collect the indebtedness. The mortgage also obligated DTP to pay all taxes levied upon the property before they became delinquent. In the event of a default on the part of DTP in performing any mortgage obligation,

including paying taxes, Fifth Third had the right to perform the obligation and DTP was required to reimburse Fifth Third on demand for all sums it expended. Upon default, the mortgage authorized Fifth Third to, among other actions, foreclose on the mortgage and granted Fifth Third the right to recover all reasonable expenses, including reasonable attorney fees and legal expenses paid or incurred in foreclosing the mortgage by advertisement.

During 2007 and 2008, DTP failed to pay the property taxes levied upon the Enterprise property totaling $457,543.53. From June 2008 through April 22, 2009, Fifth Third incurred legal fees and expenses amounting to $44,691.55 to enforce Fifth Third's rights under the note and mortgage and to initiate foreclosure of the mortgage by advertisement sale against the mortgage securing the Enterprise property.

As previously stated, a statutory foreclosure sale occurred wherein Fifth Third made a successful credit bid for the Enterprise property equal to $4,622,380.42. The full bid amount included attorney fees and delinquent taxes amounting to $44,691.65 and $457,543.52, respectively. Fifth Third did not pay the delinquent taxes until a month after the foreclosure sale.

On April 1, 2011, DTP filed a complaint against Fifth Third alleging that Michigan law governing foreclosure by advertisement prohibited Fifth Third from charging DTP more than $75 in attorney fees where an attorney is employed to foreclose by advertisement.[2] According to DTP, because Fifth Third's full credit bid included attorney's fees of $44,691.85, which exceeded the $75 amount allowed under MCL 600.2431, Fifth Third bid more than DTP was obligated to pay under the statute and the excess attorney fees included in the amount of Fifth Third's bid constituted surplus proceeds to which DTP was entitled under MCL 600.3252. In an amended complaint, DTP added a second claim alleging that it is also entitled to the amount of the unpaid delinquent property taxes owed on the property equal to $457,543.52, which constituted surplus proceeds. According to DTP, Fifth Third's successful full credit bid at the foreclosure by advertisement sale equal to the outstanding principal and interest of the mortgage fully satisfied and extinguished the mortgage debt, and thus, the amount of the unpaid property taxes included in the bid, constituted surplus proceeds that DTP was entitled to. In response, Fifth Third raised res judicata as an affirmative defense, claiming that DTP should have made these claims in the earlier quiet title action brought by Fifth Third against DTP and was now precluded from raising them.

After a hearing on competing motions for summary disposition, the trial court concluded that DTP's claims were barred by res judicata. In the interest of judicial economy, the trial court also addressed the substantive merits of the issues raised by DTP, concluding that the attorney fees included in the amount bid are statutorily limited to $75 under MCL 600.2431(2), and thus, Fifth Third made an excess bid of $44,616.65 when it included $44,691.65 for attorney fees in the amount bid at the foreclosure by advertisement sale, which DTP is entitled to as surplus proceeds from the sale. The trial court concluded, however, that it was appropriate for Fifth Third to include the unpaid delinquent taxes in the amount bid because, under the terms of the

---

[2] DTP initially filed this complaint as a class action, but after discovery proceeded as a private cause of action.

-4-

mortgage, when DTP defaulted by failing to pay the taxes, it became obligated under the mortgage to pay the taxes as part of the mortgage indebtedness. According to the trial court, unlike with the attorney fees, there was no statute precluding the parties from agreeing that the taxes are part of the mortgage indebtedness or precluding Fifth Third from including that amount in its full credit bid made at the foreclosure by advertisement sale. Therefore, according to the court, the unpaid delinquent taxes included in the bid do not constitute surplus proceeds to which DTP was entitled.

This Court affirmed the trial court's ruling that DTP's action was barred by res judicata, adding that "[g]iven our resolution of the res judicata issue, [it] need not address the other issues the parties raised on appeal." *Danou Technical Park, LLC v Fifth Third Bank*, unpublished opinion per curiam of the Court of Appeals, issued June 24, 2014 (Docket No. 309905), slip op, p 7. The Supreme Court denied leave to appeal. *Danou Technical Park, LLC v Fifth Third Bank*, 497 Mich 905; 856 NW2d 54 (2014).

C. THE INSTANT ACTION

While the class action was pending, Fifth Third sued defendants, claiming that defendants committed professional malpractice when investigating and pursuing the foreclosure action. Fifth Third complained that defendants negligently advised it to pursue a foreclosure by advertisement when title was clouded by the API mortgage and that the prudent course of action was a judicial foreclosure. Fifth Third also complained that defendants wrongly suggested that Fifth Third pursue a full credit bid, which included attorney fees that Fifth Third was not allowed to collect, resulting in Fifth Third bidding more than what was lawfully allowed. These missteps, Fifth Third argued, resulted in both the quiet title action and the class action and caused Fifth Third to incur a substantial amount of attorney fees.

Defendants filed a motion for summary disposition, arguing that they were entitled to summary disposition because of Fifth Third's failure to produce a qualified expert to testify as to the standard of care, defendants' breach, and as to the proximate cause of Fifth Third's damages. Defendants further argued that Fifth Third's claim was barred by the attorney judgment rule. Defendants' belief that the API mortgage was a nullity turned out to be correct. The decision to pursue a full credit bid was also based on sound judgment where Fifth Third wanted to eliminate a potential deficiency battle with Danou. Defendants claimed that, in any event, attorney fees incurred in bringing and defending the quiet title and class actions suits were not recoverable as a matter of law because attorney fees are not awarded as an element of damages absent malicious, fraudulent or wrongful conduct. Defendants further asserted that Fifth Third's claim for the difference in the value of the property from the time of the full credit bid to the time title was cleared was the equivalent of holding defendants liable for the recession.

Fifth Third filed a cross motion for summary disposition on January 22, 2013, wherein it argued:

> Defendants breached the requisite standard of care in representing the Bank including but not limited to: (1) failure to properly review and analyze a title commitment, which confirmed the API Mortgage remained an encumbrance of record on the Property, recorded prior to [Fifth Third's] Mortgage; (2) reliance

upon discussion with <u>opposing</u> counsel that the API Mortgage may not be effective, but never getting a written agreement to that effect; (3) having the knowledge, that to provide the Bank free and clear title to the Property required them to pursue a judicial foreclosure which would discharge the API Mortgage before any bid was made at a foreclosure auction and/or quiet title action, but failing to do so; (4) inclusion of attorney fees and costs in excess of the $75.00 cap in the process; and (5) failure to communicate with and advise the Bank as to the status and options available for the various matter entrusted to them.

Fifth Third claimed that it had incurred approximately $164,314.91 in attorney fees to defend the quiet title action and $44,436.86 in attorney fees in the class action. Fifth Third also argued that it faced damages ranging from $1 million to $3 million for the difference in fair market value at the time of the bid and the current appraised value.

At the hearing on the competing motions, the trial court indicated that defendants' expert's professional qualifications were "not the biggest issue in this case. To me the biggest issue is the attorney judgment rule. I mean, the qualifications issues to me is one I got past really easily . . .this isn't a medical malpractice action where we have . . . [a] really onerous statue that has to be complied with . . . It was not a big issue to me." The trial court denied defendants' motion for summary disposition because their arguments went to the weight to be given the expert's testimony, not whether he was qualified. The trial court further determined that it would "stay" a decision on whether Fifth Third had presented a question of fact as to whether defendants caused injury to Fifth Third by including attorney fees and costs in excess of $75 in the full credit bid. The trial court noted that because it had already ruled in the prior class action matter that it was improper to include such fees, "I don't know that we need any more in terms of proximate cause on that issue." The trial court disagreed with defendants' contention that defendants' expert failed to offer an opinion that Fifth Third was damaged because of the reduction in purchase price. Finally, on the issue of expert testimony, the trial court was satisfied that "had Defendants instituted a judicial foreclosure action, the API Mortgage could have been quieted before the judicial foreclosure sale and the redemption period expired, resulting in clear title to Plaintiff and then would only be responsible for the carrying costs."

Regarding the attorney judgment rule, counsel for Fifth Third argued that defendants could not rely on the attorney judgment rule where the attorneys "never exercised any judgment about the [API] mortgage because [they] didn't know it even existed." Counsel added:

> The Court of Appeals ruled that merger wasn't the issue, it was the nullity of the mortgage. But here's the key issue. Merger, nullity, what did the Court of Appeals do? When the Court of Appeals sent the case back to you, they said please order the title quieted. So, even if they were right and they had no right to rely upon [opposing counsel] . . .they didn't get anything of record, the title had to be quieted whether the mortgage was valid or not. And that required a quiet title action and the bank shouldn't have owned the property during all that and incurred all the carrying charges.

The trial court disagreed, stating that "the reason this case all got screwed up was because of my erroneous ruling. That's the problem with the case." The trial court granted defendants' motion

for summary disposition regarding defendants' recommendation to pursue foreclosure by advertisement under the attorney judgment rule, noting that defendants' position was legitimized by this Court's decision in the quiet title action. The trial court also ruled that the attorney judgment rule protected defendants' recommendation that Fifth Third make a full credit bid at the sheriff's sale. Finally, although it believed that the matter was moot, the trial court concluded that Fifth Third was entitled to attorney fees in the prior actions as damages. The trial court concluded:

> Now, gentlemen, basically I've knocked out all of the Plaintiff's claims other than the claim with respect to the $44,000 [class action claim] and possibly any attorney fees that might be with it. I want to see what happens in the Court of Appeals on that issue. And it's really not – and notwithstanding what I previously ruled, it's important to me to know what the Court of Appeals rules on that particular issue. Because once we know that ruling, the path becomes very clear.
>
> So, you'll prepare an order consistent with my ruling . . . on everything that I ruled in this motion. And then the last part of that order will say that this matter is stayed pending the resolution of the Court of Appeals' decision.

Once this Court decided the quiet title appeal on June 24, 2014, the matter was reopened and the final order was entered on August 26, 2014. Fifth Third filed its claim of appeal on September 12, 2014, arguing that the trial court erred in applying the attorney judgment rule. Defendants filed their claim of cross appeal on September 26, 2014, raising alternate bases for judgment in their favor.

## II. ANALYSIS

### A. STANDARD OF REVIEW

"This Court reviews a trial court's decision regarding a motion for summary disposition de novo." *Gividen v Bristol West Ins Co*, 305 Mich App 639, 642; 854 NW2d 200 (2014). As the trial court noted, the parties' competing motions for summary disposition required it to look beyond the pleadings and, therefore, the motions were sought under MCR 2.116(C)(10). "A motion for summary disposition under MCR 2.116(C)(10) tests the factual sufficiency of a claim. A motion for summary disposition under MCR 2.116(C)(10) should be granted if the pleadings, affidavits, and other documentary evidence, when viewed in a light most favorable to the nonmovant, show that there is no genuine issue with respect to any material fact." *Gividen*, 305 Mich App at 642. "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds could differ." *Bronson Methodist Hosp. v. Auto–Owners Ins. Co.,* 295 Mich App 431, 441; 814 NW2d 670, lv den 493 Mich 880 (2012).

### B. THE ATTORNEY JUDGMENT RULE

"The elements of legal malpractice are: (1) the existence of an attorney-client relationship; (2) negligence in the legal representation of the plaintiff; (3) that the negligence was the proximate cause of an injury; and (4) the fact and extent of the injury alleged." *Manzo v Petrella*, 261 Mich App 705, 712; 683 NW2d 699 (2004). Here, there is no dispute that

defendants and Fifth Third shared an attorney-client relationship, satisfying the first element. "In legal malpractice actions, a duty exists, as a matter of law, if there is an attorney-client relationship." *Simko v Blake,* 448 Mich 648, 655; 532 NW2d 842 (1995).

The attorney judgment rule provides:

An attorney has an implied duty to exercise reasonable skill, care, discretion, and judgment in representing a client. *Simko v Blake,* 448 Mich 648, 655-656; 532 NW2d 842 (1995). Further, an attorney is obligated to act as an attorney of ordinary learning, judgment, or skill would under the same or similar circumstances. *Id.* at 656. However, an attorney is not a guarantor of the most favorable possible outcome, nor must an attorney exercise extraordinary diligence or act beyond the knowledge, skill, and ability ordinarily possessed by members of the legal profession. *Id.* Further, "where an attorney acts in good faith and in honest belief that his acts and omissions are well founded in law and are in the best interest of [the] client, [the attorney] is not answerable for mere errors in judgment." *Id.* at 658, 532 NW2d 842. [*Mitchell v Dougherty*, 249 Mich App 668, 677; 644 NW2d 391 (2002).]

The attorney judgment rule thus recognizes that an attorney's tactical decisions may avoid legal liability, even when those decisions fail. Therefore, an attorney is responsible for forming a strategy that is in keeping with the law, but does not have to insure the most favorable possible outcome for his clients. *Simko,* 448 Mich at 655-658. However, an attorney may not "act with impunity and avoid malpractice liability merely because professional judgment of the attorney is at issue." *Basic Food Indus, Inc v Grant*, 107 Mich App 685, 694-95; 310 NW2d 26 (1981). As such, "a lawyer may be liable for errors of judgment that are 'very gross.'" *Id.* Consequently, while a gross error in judgment may be actionable, a mere error in judgment made in good faith is not. *Mitchell, supra* at 679, 644 NW2d 391. Ultimately, the attorney judgment rule recognizes that an attorney who makes "mere errors in judgment," may avoid malpractice liability, if the attorney acted in good faith, and demonstrated reasonable skill, care, discretion and judgment equivalent to that of the average practitioner, in performing the legal representation. *Simko,* 448 Mich at 655-658. Where a plaintiff's allegations cannot support a breach of duty because they are based on mere errors of professional judgment and not breaches of reasonable care, summary disposition is appropriate. *Simko,* 448 Mich at 659.

C. APPLICATION OF LAW TO THE FACTS

1. DEFENDANTS' RECOMMENDATION TO PURSUE FORECLOSURE BY ADVERTISEMENT INSTEAD OF JUDICIAL FORECLOSURE

Fifth Third argues that the trial court erred in applying the attorney judgment rule to shield defendants' conduct where defendants exercised *no* judgment when recommending that Fifth Third pursue a foreclosure by advertisement rather than a judicial foreclosure. Fifth Third claims that defendants' only "judgment" was reliance upon the statements of opposing counsel regarding the status of the API mortgage. It points out that defendants were wrong about the fact that merger occurred and failed to understand that the API mortgage remained a cloud on the title. In order for Fifth Third to have clear marketable title, the mortgage had to be discharged.

Thus, Fifth Third argues that even if defendants' reliance on the unrecorded Exchange Agreement and their belief that API's quitclaim deed to DTP was self-executing, the fact remained that there was still a cloud on the title and defendants took no action to get the API mortgage discharged from the record. Fifth Third argues: "the real issue was that even though there was no debt to support the API Mortgage, the Defendants completely missed the fact that it was still a lien of record." We disagree with Fifth Third's characterization of what occurred.

Citing the attorney judgment rule, the trial court granted defendants' motion for summary disposition regarding defendants' decision to pursue foreclosure by advertisement, noting that defendants' position was legitimized in this Court's decision in the quiet title action:

Often this Court has a difficult time determining whether an attorney's conduct is protected by the attorney judgment rule or is a breach of the standard of care. This is not one of those cases. It is clear that the Defendants' actions are protected by the attorney judgment rule. This Court clearly erred in the original action when it failed to conclude that when on August 9, 2001 API Properties transferred the real property to [DTP] by a quitclaim deed, the note had – the note had been fully paid and the mortgage was a nullity as ruled by the Court of Appeals . . .. It does not matter whether there was a merger of title or the mortgage was a nullity. The fact remained that the API Mortgage was unenforceable, contrary to the ruling that this Court erroneously made.

Consequently, the decision of the Defendants to proceed by way of foreclosure by advertisement is protected by the attorney judgment rule. Frankly, had this Court got the ruling correct the first time around, filing a quiet title action removing the API Mortgage would have been a mere formality and could have been done very quickly. It is this Court's error and not Defendants' actions that resulted in additional attorney fees being incurred by Plaintiff.

The trial court's decision is supported by the record. Defendants clearly exercised reasonable judgment in pursuing the foreclosure by advertisement.

Fifth Third had several individuals from its Special Assets Group (SAG) that worked on the failed negotiations and eventual foreclosure. Matthew Jaeger was a loan officer. He reported to Tim Fergan. The ultimate decision-maker was Donald Lehmkuhl.

Jaeger testified that while he was sure that there were discussions about how to proceed with the foreclosure, he "was relying on my counsel" regarding "the different options and [to] lead us in the direction that was going to be best suitable for the bank to recover its moneys." Essentially, Jaeger put the matter "in the hands of my counsel." Jaeger expected defendants to exercise their legal judgment in deciding which way to proceed.

Fergan confirmed that "outside counsel would typically review the file in its entirety as far as, you know, reviewing the credit agreements, the notes, the security agreement, mortgages, and would give opinions as far as, you know, the current conditions of the documents, so that we understood, exactly, what was there. And so that would, in general, would cover the scope of what they were expected to do."

Lehmkuhl testified that he learned of the impending foreclosure from Fergan. Lehmkuhl explained: "Matt Jaeger was handling that particular loan; however, at that time, the Matt Jaegers and the Tim Fergans of the world came into special assets from other jobs. We didn't have work-out professionals, per se, so we relied heavily on the outside counsel for any legal proceedings that would come about with our work-out strategy."

Defendant Donald Wagner testified that he worked with banks by reviewing loan documents for troubled loans and assisting with workouts and turnarounds of those loans, including drafting forbearance agreements. He was a transactional attorney and not involved with foreclosure work. Sam Giradot from Fifth Third brought the Danou matter to Wagner for review. Giradot was concerned because Danou was not paying on his loan and had threatened to file for bankruptcy. Wagner attempted to negotiate a forbearance for the loan

During his review of the file, Wagner noticed that "[t]here was a transaction in the file, but it was not of record on the title work" that he had from Greco Title. This transaction was the so-called "API transaction." Wagner acknowledged that Greco "missed" the API mortgage. Wagner explained the significance of finding the information in the bank's file:

> *Q*. ... Is it fair to say since the API transaction didn't show up on the title report or commitment that that did not appear at the time to be a concern to you?
>
> *A*. I questioned it just because it was in the file.
>
> *Q*. And when you say you questioned it, who did you ask questions of?
>
> *A*. I called the counsel for the borrower, for the debtor.
>
> *Q*. Is that Mark Hauser?
>
> *A*. Yes.
>
> *Q*. And you knew Mark Hauser prior to this case, correct?
>
> *A*. Yes.
>
> *Q*. You've known him for many years, right?
>
> *A*. Yes.
>
> *Q*. And did he disclose to you at the time that he had done work for Fifth Third Bank?
>
> *A*. Yes.
>
> *Q*. And do you know if he obtained a waiver in order to go forward with Mr. Danou? Were you involved in that process?

*A.* There was discussions about him continuing to represent Mr. Danou for purposes of a workout, but when it became adversarial, he was no longer welcome to represent Mr. Danou is my recollection.

*Q.* And when you said you contacted Mr. Hauser to discuss the API transaction, how did you contact him?

*A.* I believe I called him and followed up with an e-mail to my recollection.

*Q.* And what did he tell you about the API transaction?

*A.* He told me that the transaction had failed [] that the deal was over and not to worry about it.

Wagner assumed that there was a merger of title because the deed and the mortgage were now in the hands of the same entity and that there was no debt left to be secured. In an email exchange with Hauser, Wagner questioned why the note and mortgage for API still existed:

> The Novemeber [sic] letter seem s [sic] to indicate that API, the Assigned Note and Assigned Mortgage still existed. Yet in August of that year the deal seemd [sic] to tank. So why is there still a Note and Mortgage from API[?] I also assume that my analysis indicates there was a merger of title when the deed was executed to Danou Technical, but the question might remain whether the note still existed. If those 2 documents are of no further force and effect we should get them discharged of record.

Wagner testified that Hauser basically responded, "don't worry about it, it's no longer a debt. The deal is over. The deal failed." Wagner did not take further action to get the note and mortgage discharged because his recollection was that "it wasn't of record . . .according to the title work I had." He also relied on Hauser's statements and the fact that the API mortgage was "self-executing." Wagner explained what he meant by self-executing: "My recollection is that the instruments governing the failed 1031 provided its own mechanisms without further action necessarily that would have resulted in the property and the mortgage being no longer of any force and effect." Wagner "took Mr. Hauser's responses verbally and e-mails to be" an assurance that there was a merger of title.

Wagner later learned that Danou claimed to have first priority with the API mortgage. Wagner's "immediate reaction would have been, one, it wasn't a record to my knowledge; two, counsel for the borrower at the time told us the thing had failed; three, that there had been merger of title as a matter of law; and fourthly, that the document governing the API transaction was self-executing." Wagner acknowledged that the API litigation negatively affected the value of the property.

Wagner acknowledged the existence of the Mortgage Modification Agreement but that it did not impact his opinion:

*Q*. So it would appear that both the bank and Danou were at least still of the belief that the API Mortgage and the Collateral Assignment were in effect, correct?

*A*. I don't know what they intended.

*Q*. Is this, do you recall whether this specific paragraph [full force and effect clause] was pointed out to you in the loan review that was provided to you by another lawyer at your office?

*A*. No, I do not recall.

*Q*. Had you seen this, would it have caused you any concern in terms of how to proceed with a foreclosure?

*A*. Not to me.

*Q*. Do you agree this seems to contradict what Mr. Hauser told you?

*A*. No.

*Q*. Okay. How is it not contradictory?

*A*. Because I didn't know at what point the deal failed, and if it failed after the date of the Mortgage Modification Agreement, then the concepts of merger and no debt, no security would have still prevailed.

\*\*\*

*Q*. If you understood the deal failed before this Mortgage Modification Agreement . . .would you have taken any specific action given the existence of paragraph 3 in this document?

*A*. I don't know. If the note is, if the note was satisfied, but there was a merger of title, there was no debt, I still wouldn't have had to do anything if it was not recorded.

Wagner talked to Giradot about the API transaction, noting "that I had seen it, buttoned up the title work and we were advised by borrower's counsel that the deal had failed. . . .And proceed along." When negotiations failed, Wagner referred the matter to his colleague, Mark Frankel, to start the foreclosure process. Wagner told Frankel "that there was this API Mortgage situation and Mark Hauser said not to worry about it and it wasn't of record."

Only when Fifth Third attempted to sell the property did Wagner learn about the American Title commitment, which evidenced the API mortgage:

*Q*. Okay. Is a mortgage, such as this mortgage, an encumbrance of record as this title commitment describes it?

-12-

*A.* It is an instrument of record.

*Q.* Does it encumber the property?

*A.* If it's valid and enforceable.

*Q.* And if it's not valid and not enforceable, then what is it, just a cloud on the title?

*A.* May have no ultimate effect on the title.

Frankel was the foreclosure attorney that took over the case once negotiations failed. He specialized in foreclosure-related matters and general commercial litigation. Frankel explained that a judicial foreclosure is generally sought: 1) when there is a problem with title; 2) when the mortgage did not have a power of sale clause; or, 3) as a defensive counterclaim to a debtor's primary action. A quiet title action was only needed to determine the priority of liens but "[i]f you're certain that the lien priorities are what they are, in this state, the foreclosure by advertisement wipes out junior liens. You don't have to go to judicial foreclosure to do that." He explained: "Whether you file a judicial foreclosure or not, you could just do a quiet title action to ask the Court to determine that that lien has been extinguished, which you could run contemporaneously with . . .a foreclosure by advertisement. You wouldn't want to obviously go to sale before you got the judgment, but you could run them simultaneously or you could do it as a judicial foreclosure." Frankel admitted that when he made the decision that the API mortgage had no validity, he never discussed the issue with Fifth Third and did not explain the options for going forward.

Frankel did not believe that he needed to worry about the API mortgage:

*Q.* If I understood what you just said, you said it wasn't necessary to worry about the API Mortgage because it had been released and extinguished; is that what you said?

*A.* Yes, that was our judgment, yes.

*Q.* And you based that judgment upon your discussions with Mr. Wagner?

*A.* Yes.

*Q.* Did you have independent evidence of it being extinguished?

*A.* There was the mortgage, which was in my recollection, February of '01. And based on the 1031 exchange, which only required API to return title of the property back to Danou, that was the only thing they were ever going to do. There was [a] quit claim deed from API to Danou that did not have any language in it that suggested that they were trying to avoid merger.

-13-

*Q.* What about the language in the collateral assignment agreement, did you review that at the time that you made the judgment that this mortgage may have been extinguished?

*A.* No.

\*\*\*

*Q.* Let's just assume for a second that your opinion was different, that you weren't certain that this was extinguished one way or another.

*A.* Yes.

*Q.* Would the notice of foreclosure have wiped out this mortgage?

*A.* If I wasn't certain that it was as written, no. Is that what you're asking me?

*Q.* Right.

*A.* As written, no, of course not.

*Q.* And that's because this mortgage was ahead of the Fifth Third Bank mortgage?

*A.* It was still valid, yes.

*Q.* It was actually the first lien on the property and then Fifth Third took that as collateral assignment and then they had a mortgage which they modified and reduced, correct?

*A.* Yes.

*Q.* So that in terms of going forward with the notice of foreclosure where it would extinguish junior liens, it would not extinguish a superior lien, correct.

*A.* True.

Frankel did not receive written confirmation that the mortgage was discharged "other than Mark Hauser's e-mails." Prior to that, he had just had an oral discussion with Wagner. Frankel testified that he knew that Wagner "had both an e-mail exchange and a verbal exchange with Mark Hauser, and it was the totality of those two exchanges" that led Frankel to believe the API mortgage lacked validity. "I'm looking at the totality of seeing the mortgage, seeing the quit claim deed and seeing this exchange to say, yes, it was extinguished by operation of law." Had Frankel believed the API mortgage had any validity, he would have either brought a judicial foreclosure or a foreclosure by advertisement tied to a quiet title action.

Frankel was not convinced that the API mortgage in the chain of title created a cloud on the title: "I mean a cloud is somewhat in the eye of the beholder in this case. I think combined

-14-

between the mortgage and the quitclaim deed, which has no anti-merger language, that it shouldn't be a cloud of the title." After receiving the First American Title foreclosure policy, Frankel never contacted Greco to discuss the discrepancy. In any event, Frankel listed the API mortgage, not because it was listed in title work, but because it was in the bank's file.

Frankel expressed his confusion as to the Mortgage Modification Agreement – "[i]t was a modification of the API Mortgage, which was bizarre because you had a mortgagee and the assignee of the mortgagee modifying the mortgage without the mortgagor agreeing. None of it made any sense, to me anyway." The modification appeared to have no import because "you can't revive it by saying so afterwards if you're not the mortgagor." Thus, while there was a "full force and effect" clause in the modification agreement, Frankel could not "fathom" how that would work. Again, Frankel concluded that "[t]he only obligation of API at any time was to give a deed back to Danou, and that fully satisfied every obligation that API had to Danou. There were no other obligations because the whole thing is, is a straw transaction to comply with the IRS regulation of their 1031."

Frankel testified:

> *Q*. And isn't it fair to say that all of this could have been avoided had the quiet title action been initiated at the time you began the advertisement for foreclosure?

> *A*. Well, you certainly wouldn't have obviated the, the quit claim action. It still would have happened, yes.

> *Q*. What I'm saying is, you would have still had the fight. Because they would have raised – you would have filed the quiet title action and they would have raised –

> *A*. Yes.

> *Q*. – the validity of the API Mortgage. The difference would have been the bank wouldn't have yet owned the property?

> *A*. Right.

> *Q*. And wouldn't be in the position of being the responsible party for maintaining the property during the pendency of all this, for instance, right?

> *A*. Sure.

The foregoing evidence supports the trial court's decision. Fifth Third argues that defendants did not even know about the API mortgage, but it is obvious that they did. This was not a matter of mere oversight or poor case management, but rather was an affirmative conclusion by defendants that the API had no validity. *Mitchell*, 249 Mich App at 677. Fifth Third failed to present evidence that the measures that defendants took in investigating the matter were less than an attorney of ordinary learning, judgment, or skill would have done under the same or similar circumstances. *Simko*, 448 Mich at 655-656. In essence, Fifth Third alleges that

defendants erred in their judgment regarding the cloud of title. Although "gross" errors in judgment can be actionable, *Basic Food,* 107 Mich App at 694, mere errors in judgment by attorneys acting in good faith are not. *Simko,* 448 Mich at 658. Fifth Third presented no evidence that defendants' determination that the API mortgage had no validity was anything other than an honest belief well founded in the law and in the best interest of their clients. *Basic Food*, 107 Mich App at 694. And, of great significance, defendants were absolutely correct and the API had no validity as evidence by this Court's decision in the quiet title appeal.

## 2. DEFENDANTS' RECOMMENDATION TO OFFER A FULL CREDIT BID RATHER THAN A DEFICIENCY BID AT THE SHERIFF'S SALE

Fifth Third next argues that the trial court erred when it concluded that defendants' recommendation to make the full credit bill was protected by the attorney judgment rule. Failure to realize that the Enterprise property had a clouded title led Fifth Third to give up other collateral and purchase the Enterprise property, which it later could not sell because of the clouded title. Fifth Third argues that "[a]lthough the Bank did make the ultimate decision regarding the Credit Bid, the record plainly established that it made the decision in heavy reliance upon the advice and expertise of counsel." We conclude that the trial court did not err in granting summary disposition on this issue.

The trial court ruled that the attorney judgment rule protected defendants' recommendation that Fifth Third make a full credit bid at the sheriff's sale:

> The facts regarding this issue are undisputed. There is no dispute that Defendants recommended to Plaintiff that there be a full credit bid to eliminate the possibility of a lawsuit if a lesser amount was bid claiming the bid was not fair market value. It is also undisputed that this issue was extensively discussed among the employees of Plaintiff and the recommendation of Defendants' counsel as accepted to make a full credit bid. Under these circumstances, again, the attorney judgment rule applies. The full credit bid was made to avoid a possible lawsuit if a lesser bid was made at the sheriff's sale.

Jaeger from the SAG group testified that he worked with Frankel on a bid plan and the final authority for that plan came from Fifth Third's management. Jaeger testified that the decision was to bid the full amount "based on factors that were prevalent in the case." Jaeger indicated that "[i]t was a collaborative effort. There was reluctance to bid all in based on an inability to have a deficiency, but it was expressed by our counsel that that's – a deficiency defense was already in play to defend a lesser bid amount." The ultimate authority regarding the bid amount rested with Lehmkuhl. Jaeger testified that he spoke with Frankel on numerous occasions and used Frankel's "knowledge to drive the strategy and . . . my management was supportive of that strategy." Fifth Third's goal was to recover its assets. "The plan with the lower bid was to see if there was an interested market out there for the purchase. So if there was – if we were outbid after the initial offering, we would have let the sale occur and we would have

had a deficiency against Mr. Danou for the remainder."[3] But Jaeger was led to believe that there would be costs associated with defending a deficiency bid. So, ultimately, "we were bidding the full amount to get . . .repaid in full for indebtedness with the thought that the borrower had a deficiency defense lined up that would cost us money had we taken the bid at the lower dollar amount." This was based on the rumor that Danou had "come into some money and he could redeem it at the full price." One thing was certain – Fifth Third did not want further litigation.

Fergan also testified that Fifth Third played a large role in deciding how to bid. During conference calls, both Frankel and Lehmkuhl "were very adamant that we needed to go in with a full credit bid on the Danou foreclosure, because of the fact that there was some recent interest expressed in the property from a purchase standpoint" combined with the fact that "Danou's counsel was prepared to make a strong deficiency claim defense against the bank and it would be money wasted by the bank to pursue a deficiency bid strategy when they felt very strongly that Danou was in a position to make a defensive claim against that." Fergan noted neither he nor Jaeger had any expertise because it was the first foreclosure for their SAG group. Frankel was advised that Fifth Third needed defendants' expertise to "really drive the process . . .including how the bank should bid." While Fergan understood that Fifth Third had the option of doing a full credit bid or a deficiency bid, "[w]e were relying on our counsel to guide us in terms of what was the appropriate strategy, given the circumstances." It was defendants' "strong recommendation that we go in with [a full] credit bid. . . .And you know, that's part and parcel why we hire outside legal – they're the experts in issues of foreclosure, or they should be – for that guidance." At the time, Fergan believed that defendants' recommendation seemed reasonable.

Lehmkuhl testified regarding emails that went back-and-forth about what Fifth Third would bid at the auction:

> *Q.* Were you involved in any way in discussing that bid?
>
> *A.* In that E-mail string I questioned Tim Fergan as to the methodology of the bid.
>
> *Q.* And tell me what you mean by that.
>
> *A.* I asked why we would make a full price bid.
>
> *Q.* And why did that strike you as something you should ask about?
>
> *A.* Because if we made a full price bid, we would not have a deficiency, that we would no longer have the cooperation of the debtor.

***

---

[3] The property had appraised at $5.1 million and a $3.9 million bid would have sparked a deficiency claim.

-17-

*A.* . . .as it pertains to a Michigan foreclosure, I had very little knowledge of exactly how that worked. I have not ever been involved in a Michigan foreclosure. That was one of the reasons theoretically why I would rely on a Michigan law firm. So the best of my understanding at that time on how Michigan treats a deficiency, that's how I understood it, if we bid the full bid, we would not have a deficiency.

He was concerned that a full bid would result in no deficiency, no cooperation, and no money. Jaeger was the Fifth Third representative at the sheriff's sale and his instruction would have been to "have counsel present and rely on the advice of counsel." After the sale, Jaeger told Lehmkuhl that counsel told him Lehmkuhl "did not know Michigan law and that we would be sued on a deficiency if we didn't bid a full credit bid." In retrospect, Lehmkuhl believed this was "bad advice" because "just making a bid that created a deficiency doesn't open us up for litigation unless we go after the deficiency, and . . . making a full credit bid caused us to lose forty additional acres of collateral that we later had to release." Lehmkuhl was dismayed by the whole process because "we did not have a deficiency and at that time I thought we had a piece of property later to discover that we didn't even have a free and clear piece of property."

Frankel defended the decision to proceed with a full credit bid. He explained that the bid amount of $3.8 million was based on an appraisal Fifth Third had received when it originally planned to pursue a deficiency. The bid had to be based on the property's fair market value.

*Q.* And the bank had an appraisal in that 3.8- million-dollar range?

*A.* Yes.

*Q.* Did something change[] that caused the bank to make the full credit bid?

*A.* Yes.

*Q.* What was that?

*A.* Mr. Jaeger believed that Mr. Danou had come into some money and intended to redeem the property. Mr. Jaeger told me he did not want to do battle with Mr. Danou over the deficiency and asked how he could avoid it.

      I told him you could make a full credit bid, and he said that he would consult with his group at the bank and get back to me. And he said that's what they wanted to do.

*Q.* Did he appear to understand that by making the full credit bid there would be no money owed from Danou after the redemption period had ended?

*A.* Yes.

*Q.* Was Danou present at the sale?

*A.* Yes.

In fact, Jaeger insisted that there be a full credit bid.

The foregoing evidence supports the trial court's decision. Once again, defendants' alleged error was not a matter of mere oversight or poor case management, but rather was an affirmative conclusion by defendants that a full credit bid, rather than a deficiency bid, was the best option to pursue. *Mitchell,* 249 Mich App at 677. Fifth Third failed to present evidence that the measures that defendants took in investigating the matter were less than an attorney of ordinary learning, judgment, or skill would have done under the same or similar circumstances. *Simko,* 448 Mich at 655-656. In essence, Fifth Third alleges that defendants erred in recommending that it make a full credit bid. Although "gross" errors in judgment can be actionable, *Basic Food,* 107 Mich App at 694, mere errors in judgment by attorneys acting in good faith are not. *Simko,* 448 Mich at 658. Fifth Third presented no evidence that defendants' recommendation that a full credit bid was the best course of action was anything other than an honest belief well founded in the law and in the best interest of their clients. *Basic Food,* 107 Mich App at 694.[4]

Affirmed. As the prevailing party, defendants may tax costs. MCR 7.219.

/s/ Michael J. Talbot
/s/ Mark J. Cavanagh
/s/ Kirsten Frank Kelly

---

[4] To the extent Fifth Third argues that Frankel's erroneous inclusion of $44,691.65 for attorney fees and costs subjected it to the class action, we note that this claim is different from Fifth Third's more general claim that the foreclosure by advertisement should not have taken place at all.